UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| PAUL W. STANFIELD and : <br> BARBARA J. STANFIELD, : <br> : <br> Plaintiffs : <br> : <br> vs. : <br> : <br> CHARLES G. JENKINS, SR. and, : <br> ERNEST R. McNABB, : <br> : <br> Defendants : <br> : <br> v. : <br> : <br> CHARLES LOVE, BROWN PETROLEUM : <br> COMPANY, LLC and CENTRAL OIL : <br> COMPANY, INC., : <br> : <br> Third-Party Defendants : | Civil Case No. 1:03-cv-231 <br> Magistrate Judge Carter |

MEMORANDUM

I. Introduction

This case arises from a sale of land, (the Property), subsequently determined to be contaminated by gasoline, by Charles Jenkins to Barbara and Paul Stanfield. Charles Love, Brown Petroleum Company, LLC (Brown Petrol), and Central Oil Company, Inc. (Central Oil) move for summary judgment on Charles G. Jenkins' and Ernest Ray McNabb's respective claims filed against them alleging they are responsible for the Property's gasoline contamination (Doc. No. 56). While Love, Brown Petrol, and Central Oil (collectively referred to hereinafter as "the Oil Suppliers") have raised a number of arguments why the Court should grant their motion for summary judgment, the Court finds the most compelling reason to be a lack of evidence to support Jenkins' and McNabb's allegation that the Oil Suppliers caused the gasoline

1

contamination of the Property. For the reasons stated herein, the Oil Suppliers' motion for summary judgment will be GRANTED.

## II. Background

*A. Procedural History*

On January 30, 1999, Charles Jenkins sold a tract of real estate in Marion County near Jasper, Tennessee to the Stanfields. According to the plaintiffs, Jenkins misrepresented to plaintiffs that they were purchasing a tract of land with no environmental defects and that this misrepresentation was a direct result of Jenkins' negligent failure to inspect the Property before making such a representation (Plaintiffs' Verified Complaint, ¶¶ 31-33). Plaintiffs further allege they bought the Property in reliance on Jenkins' misrepresentation and that when they attempted to obtain financing for the Property in late Fall of 2002 to pay the remainder of the purchase price to Jenkins, they were denied financing after an inspection revealed gasoline on the premises (Plaintiffs' Verified Complaint, ¶ 15). As a result, the plaintiffs were not able to obtain financing for the Property, and Jenkins foreclosed.

The Stanfields also allege that the gasoline which contaminated the Property came from a gas station, the Cedar Grove Convenience Store, which lies adjacent to U.S. 41 and directly across U.S. 41 from the Property. The Stanfields have sued Ernest McNabb, owner of the Cedar Grove Convenience Store, for negligence; nuisance; violations of the Underground Storage Tank Act, 42 U.S.C. §§ 6991 and 6991(a-I), and the Clean Water Act, 33 U.S.C. § 1251; and for specific performance and injunctive relief.

On March 15, 2004, McNabb filed a Third-Party Verified Complaint asserting the Oil Suppliers are responsible for the contamination of the Property. McNabb alleges in this third-party complaint that Charles Love, while employed by Brown Petrol and Central Oil, negligently

2

spilled approximately fifty gallons of regular gasoline while delivering fuel to the Cedar Grove Convenience Store. McNabb further alleges that the spilled gasoline migrated across U.S. 41 via an underground culvert thereby contaminating the Property. McNabb asserts a claim of negligence against the Oil Suppliers. He also asserts the following claims against Brown Petrol and Central Oil: violations of the Underground Storage Tank Act, 42 U.S.C. §§ 6991 and 6991(a-I), and the Clean Water Act, 33 U.S.C. § 1251, nuisance, and negligent entrustment by allowing its employee, Charles Love, to deliver the fuel. Mr. Jenkins asserts cross claims of negligence and indemnification against the Oil Suppliers. The Oil Suppliers now seek summary judgment on all Jenkins' and McNabb's claims against them.

The parties have submitted the depositions of Charles Love, William E. Simmons, Ernest McNabb, and Samuel D. Lambert, as well as other exhibits, to support their respective positions in regard to the Oil Suppliers' Motion for Summary Judgment.

*B. Relevant Facts*

1.  *Charles Love's Deposition*

On March 24, 2000, Charles Love, while working as an employee of Brown Petrol, drove a truck loaded with regular gasoline to the Cedar Grove Convenience Store in Marion County, Tennessee, near Jasper, Tennessee, to deliver approximately 2,000 gallons of gasoline (Love Dep. at 9-12). The truck had two hoses to transfer fuel to an underground storage tank (Love Dep. at 9-10). At the end of each hose was a pipe with a nozzle used to place inside an underground storage tank to transfer the fuel (Love Dep. at 20). Squeezing the nozzle on the pipe opened the hose line and allowed gasoline to be pumped into the underground storage tank (Love Dep. at 21-22).

3

While Love was transferring regular unleaded gasoline to the underground storage tank, pressure built up in the line and caused the hose to jump up out of the storage tank opening spewing fuel on the asphal (Love Dep. at 24). Love, who had been watching the transfer, grabbed the hose and squeezed the nozzle to stop the flow of gas (Love Dep. at 24). Love estimated it took him a couple of seconds after the hose jumped up to stop the flow of gas (Love Dep. at 24).

During his deposition, Love used a map made by Remedial Solutions, Inc. to facilitate his testimony.[1] The map shows that U.S. 41 runs in a northwest and southeast direction through Marion County (*See* map, Appendix 1). Cedar Grove Convenience Store is situated on the southeast side of U.S. 41. *Id.* The Property at issue is directly across from the Cedar Grove Convenience Store on the other side of U.S. 41. *Id.* Drainage ditches run along both sides of U.S. 41. *Id.* A storm drain or culvert located at the north corner of the Cedar Grove Convenience Store lot crosses under U.S. 41 to the drainage ditch on the other side of the highway (*Id.*).

After Love spilled the fuel, he observed it begin to flow slowly across the convenience store parking lot (Love Dep. at 33-34). He immediately went to ask William Simmons, the manager of the store, for a water hose (Love Dep. at 33-34). He did not remember anyone using a push broom to push the gasoline across the parking lot and into the grass (Love Dep. at 35). Either Love or Simmons then used the water hose to wash down and spray the gasoline across the parking lot in a westerly direction off the pavement to a spot which was then part of a grassy field. The spot is designated on the map as MW-3 (Love Dep. at 25-26, 34-35). Love drew on

---

[1] This map, which was Exhibit 9 to the Love deposition, is attached as Appendix 1 to this Memorandum.

4

the map the flow of the spilled gasoline from the underground storage tanks to MW-3 (Love Dep. at 25, *see also* Appendix 1). Love was asked if he saw the gasoline go into a ditch. He responded, "No, it didn't run into a ditch. There wasn't no ditch there at that time. It was just an open field there, and the gas went off the pavement right into that open field" (Love Dep. at 26). Asked about a culvert going under U.S. 41, Love stated there was a culvert "way out here at the road," but that he did not see any of the spilled gas moving towards that culvert (Love Dep. at 26-27).

Love estimated he had spilled about twenty gallons (Love Dep. at 41). The nozzle on the fuel hose was one and a quarter inch wide with a capacity of releasing about forty-five gallons a minute (Love Dep. at 41). Love stated he knew that he did not spill fifty gallons but "to satisfy his [Simmons'] mind that he wasn't paying for something he didn't get, I just wrote fifty gallon [sic]" on a ticket giving the convenience store a fifty gallon credit (Love Dep. at 32).

*2. William E. Simmons' Deposition*

William Simmons testified to the following: Mr. Simmons became the operator of the Cedar Grove Convenience Store in 1998 (Simmons Dep. at 10-11). He is unaware of any gasoline spills at the convenience store besides the one which occurred on March 24, 2000 (Simmons Dep. at 14). From the time he began as an operator at Cedar Grove Convenience Store until the March 24, 2000, spill, the underground storage tanks and the piping leading from the underground storage tanks to the dispenser island were not tested for tightness (Simmons Dep. at 16). The dispensers themselves were tested by the State of Tennessee to ensure that they were dispensing the amounts indicated on the meters (Simmons Dep. at 16).

It was a warm and sunny day on March 24, 2000 (Simmons Dep. at 39). Simmons could not remember whether Love came into the store and informed him of the fuel spill or he saw the

5

fuel coming down the parking lot. However, once he was aware of the spill, he immediately went to obtain a water hose and broom (Simmons Dep. at 31-32). He could see on the asphalt parking lot a spill of about two feet wide, an inch high, and thirty feet long (Simmons Dep. at 32-33, 56). The spill had flowed slowly from the underground storage tank area to within about six feet of the convenience store's front door where it had begun to pool (Simmons Dep. at 33, 56-58). While Love squirted the water on the gasoline, he pushed the water and gasoline mix with the broom to the other side of the parking lot (Simmons Dep. at 33- 35). During this time, a customer, Sam Lambert, arrived at the convenience store to purchase a drink (Simmons Dep. at 35-36). Simmons went back inside the store so Lambert could pay for the drink (Simmons Dep. at 36). Love continued spraying the gasoline with water to move it across the parking lot (Simmons Dep. at 37). When Simmons returned, they finished spraying the water and gasoline mix with the hose and pushed it with the broom off the edge of the asphalt over a two foot bank into a grassy area designated as MW-3 on the map prepared by Remedial Solutions Inc. (Simmons dep. at 37-39, 60, Appendix 1). He did not know the natural flow of water once it went over the bank (Simmons Dep. at 60). He did not know what happened to the water and gasoline after they hosed and pushed it into the grass (Simmons Dep. at 48). The water/gasoline mixture could have flowed toward Highway 41 or it could have continued across the grassy field away from Highway 41 (Simmons Dep. at 61). He estimated it took about thirty minutes to spray and push the gasoline across the parking lot to the area designated as MW-3 (Simmons Dep. at 40).

When they were finished, Love came into the store and took fifty gallons of gasoline off the bill (Simmons Dep. at 41, 44). Simmons testified he did not actually know how much gasoline was spilled but that he did not disagree with Love's decision to take fifty gallons of

6

gasoline off the bill. He also testified that if Love estimated the spill to be somewhere between twenty to thirty gallons, he would not have any reason to disagree with that estimate (Simmons Dep. 44-45). He did measure the gas level in the tank with a measuring stick after the spill and Mr. Love's decision to credit him for fifty gallons of gas "seem[ed] about right" (Simmons Dep. at, 67-68).

Simmons quit selling gasoline at the convenience store "right after the [March 24, 2000] spill (Simmons Dep. at 11). Sometime after the March 24, 2000 spill, McNabb had the underground storage tanks removed (Simmons Dep. at 50-51). He could not remember if the underground storage tanks were removed before or after gas was discovered in the ditch (Simmons Dep. at 56). Simmons observed the tanks after they were removed and he saw no holes in them (Simmons Dep. at 65). From the time the water company found gas in the ditch parallel to U.S. 41 and directly across it from the convenience store to the time the tanks were removed from the ground, the tanks were not tested by anyone, nor was the piping to the pumps or the pumps themselves (Simmons Dep. at 51, 61). However, during the time he sold gasoline, Simmons measured the level of gasoline in his tanks with a measuring stick each time more gasoline was delivered to him. He also kept a total of the gasoline sold each day so that he could determine how much was left in the tank before ordering more (Simmons Dep. at 64-65). He did not notice gasoline ever being lost using this method to measure gasoline in the tank (Simmons Dep. at 65).

*3. Ernest McNabb's Deposition*

Ernest McNabb was and is at all times relevant the owner of the Cedar Grove Convenience Store (McNabb Dep. at 6). In 1999 he rented the convenience store to William Simmons (McNabb Dep. at 7). McNabb learned about the March 24, 2000, gas spill about a

7

year after it took place, (McNabb Dep. at 8), when the City of Jasper was digging a water line across U.S. 41 from the convenience store and found gas in the ditch directly across Highway 41 from the store (McNabb Dep. at 8, 11). He then hired an environmental company called Ready Solutions, Inc. to clean up the gasoline (McNabb Dep. at 9-10). Approximately fifty-two gallons of gas were found in the area (McNabb Dep. at 12). The Cedar Grove Convenience Store stopped selling gasoline on September 11, 2001, which was the day McNabb had the underground storage tanks removed. McNabb observed the tanks when they were removed and could find no holes in them. On April 10, 2001, prior to the tanks' removal, he had the tanks tested for tightness (McNabb Dep. at 22). The testing was conducted by Independent Tank Testing and Services, Inc. and the test report was attached as Exhibit 2 to McNabb's deposition (McNabb Dep., Exhibit 2). The report indicates "current EPA standards dictate that for under ground fuel tanks, the maximum allowable leak/gain rate over the period of one hour is .10 gallons." *Id.* The report further provides that Tank #1 at the Cedar Grove Convenience Store holds regular unleaded gasoline and that the "tank is tight." *Id.* However, the report also states that the tank is leaking .030028 gallons per hour. *Id*. Mr. McNabb was fined $2,000 by the State of Tennessee for failing to report the March 24, 2000 spill; however, he sent the ticket to David Harris at Brown Petroleum who then sent McNabb $2,000 to cover the fine (McNabb Dep. at 69). Finally, a report dated November 9, 2004 and prepared by the Tennessee Division of Underground Storage Tanks indicates approximately 53 gallons of gasoline has been recovered from the ditch across U.S. 41 from the Cedar Grove Convenience Store from April 20, 2001 to October 1, 2004 (*See* Report attached as Ex. 3 to McNabb's Dep. which is attached as Ex. 2 to McNabb's Response, Doc. 68).

8

*4. Sam Lambert's Deposition*

On March 24, 2000, Sam Lambert drove to the Cedar Grove Convenience Store to purchase a drink (Lambert Dep. at 15-16). He pulled into the parking lot crossing over about a two foot wide stream of gasoline and parked in front of the store (Lambert Dep. at 15-16, 18, 37). When exiting his truck, he saw Simmons hooking up the water hose (Lambert Dep. at 15-16). He asked Simmons what he was doing, and Simmons told him he was washing down some spilled gasoline before someone set it on fire (Simmons Dep. at 15). Lambert then went into the store, obtained his drink, and put the money for it on the counter (Lambert Dep. at 15-16). When he came out of the store, Lambert saw Simmons spraying down the gasoline. Lambert could not identify the delivery truck driver because "I just seen his legs under the truck" (Simmons at 15). He could not tell how much gasoline had spilled (Lambert Dep. at 21, 35). Lambert then entered his truck and left. He was on the store premises approximately three or four minutes (Lambert Dep. at 15-6).

Later in his testimony, Lambert stated that he saw the gasoline and water mixture flowing from the storage tank area across the parking lot to a wire fence (Lambert Dep. at 30). He then testified:

> Q. Okay. Now did it go across the highway?
> A. It went under the highway. There's a culvert right at that property line that goes under the highway.
>             *       *       *
> Q. Okay. So, as I understood it, it went from the far end of the convenience store parking lot all the way across the parking lot?
> A. Right.
> Q. And then went into a culvert that was just next to the convenience store parking lot; is that right?
> A. Yes, sir.
>             *       *       *
> Q. And then to the best of your knowledge that culvert went underneath the highway?

9

A. Right.

(Lambert Dep. at 30-31).

However, at the very end of his deposition, Lambert testified as follows:

Q. All right. Now the other point I wasn't sure about, I thought you told me that when you left, that stream [of gasoline] had not quite made it over here to the ditch line, it was still in the parking lot. Did I misunderstand that or is it correct, that you left before it got over here to the ditch line?
A. I don't remember saying and I don't remember where the gas was, or whatever the liquid was really.
Q. All right. That's fine, sir.
A. But I'm assuming, now, it was the full length of the parking lot.
Q. Now, see, that's what we don't want you to do. We don't want you to assume.
A. Oh, okay.
Q. What do you remember? Do you remember one way or the other as to whether or not it had made it all the way over to the ditch line? Do you remember one way or the other?
A. No.
\* \* \*
Q. Do you remember when you were first answering questions the very first time for Mr. Lowe mentioning the gas going across the road?
        Mr. Lowe: Objection.
A. Well, I guess I was assuming, because that's the only place it had to go. It had to be, I mean.

(Lambert Dep. at 45-46).

*5. Affidavit of Dominick Amari, P. G.*

In support of their position that the gasoline spilled on March 24, 2000 could not have crossed under U.S. 41 to the Property via a culvert located at the north corner of the convenience store, the Oil Suppliers offer their expert witness' affidavit. In his affidavit, Dominick Amari stated in relevant part:

He is a professional geologist licensed in Tennessee (1991), Kentucky (1992), Missouri (1993), and Texas (2003) with over thirty years practical experience as a geologist (Amari Aff. ¶

10

1). He has reviewed the depositions taken in this case as well as the various site maps, correspondence, and reports prepared by Remedial Solutions, Inc. and S&SME, Inc. He has also made an inspection of the site at issue (*Id.* at ¶ 2). Based on this information, Amari opines that "the surface spill did not cross the highway and did not reach the Jenkins' property... Any residual gasoline not dissipated, evaporated, or absorbed in the soil would have flowed away from the convenience store and away from Jenkins' property" (*Id.* at ¶ 4). He explains:

> The topography of this area is such that any surface residual gasoline in the ditch along the edge of the parking lot would run away from the Jenkins Property. In addition, over time, there would have been further dissipation, evaporation, and natural biomediation or biological degradation of the liquids due to micro organism activity. It is important to note in addition that the gasoline spill occurred in March 2000, over a year before the contamination on the Jenkins property was discovered in April 2001, meaning biomediation had been ongoing for that period of time.
>
> \*   \*   \*
>
> In addition, the surface spill would have been moved along the topographic gradient by gravity and the pumping effect of rainfall and storm water, away from the Jenkins' property.

(Amari Aff. ¶¶ 5-6). He further states "the spill was directed to a location off the McNabb's property where the natural drainage took the spill away from the Jenkins' property" (Amari Aff. ¶ 9). Attached to Amari's affidavit are several topographic maps showing the slope of the convenience store parking lot and the surrounding area.

As to what actually caused the contamination, Amari opines that the contamination found on the Property "came either from underground storage tank leaks at the convenience store and/or leaks in the piping from the underground storage tanks to the dispenser island, not from this surface spill" (Amari aff. ¶ 6).

11

III. Discussion

   A.   *Standard of Review*

Under Fed. R. Civ. P. 56(c), the Court will render summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to conclusively show no genuine issue of material fact exists, *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994, *cert. denied*, 516, U.S. 806 (1995)); *Kentucky Div., Horsemen's Benev. & Prot. Assoc., Inc. v. Turfway Park Racing Assoc., Inc.*, 20 F.3d 1406, 1411 (6th Cir. 1994), and the Court must view the facts and all inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Oakland Gin Co., Inc. v. Marlow*, 44 F.3d 426, 429 (6th Cir. 1995); *City Management Corp. v. U.S. Chemical Co., Inc.*, 43 F.3d 244, 250 (6th Cir. 1994).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party may not rest on its pleadings, but must come forward with some significant probative evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Lansing Dairy*, 39 F.3d at 1347; *Horsemen's Benev.*, 20 F.3d at 1411; *see also Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404-06 (6th Cir. 1992) (holding courts do not have the responsibility to search the record *sua sponte* for genuine issues of material fact). A verified complaint can satisfy the burden of the nonmovant to respond. *Smith v. Campbell,* 250 F.3d 1032, 1036 (6th Cir. 2001). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

The Court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2510-11, 91 L. Ed. 2d 202 (1986); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435-36 (6th Cir. 1987). The standard for summary judgment mirrors the standard for directed verdict. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S. Ct. at 2512. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the Court concludes a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter summary judgment. *Id.*; *Lansing Dairy*, 39 F.3d at 1347; *Horsemen's Benev.*, 20 F.3d at 1411.

*B. Analysis*

As previously stated, McNabb asserts a claim of negligence against the Oil Suppliers. He also asserts the following claims against Brown Petrol and Central Oil: violations of the Underground Storage Tank Act, 42 U.S.C. §§ 6991 and 6991(a-I), and the Clean Water Act, 33 U.S.C. § 1251, nuisance, and negligent entrustment by allowing its employee, Charles Love, to deliver the fuel. Jenkins asserts cross claims of negligence and indemnification against the Oil Suppliers. The Oil Suppliers now seek summary judgment on all Jenkins' and McNabb's claims against them.

All of these claims, whether asserted by McNabb or Jenkins, are based on the alleged factual premise that it was the March 24, 2000 fuel spill by Love while working for Brown Petrol/Central Oil which caused the gasoline contamination of the Property (*See* McNabb's Verified Third Party Complaint ¶¶ 8, 10, 12, 14, 16, 18, 19, 23 and 24, Docs. 12 and 36, and

13

Jenkins' Cross Claim Against Love, Brown Petrol and Central Oil ¶ ¶ 3-5, Doc. 43). Thus, whether the March 24, 2000 fuel spill caused gasoline contamination of the Property the Stanfields bought is a necessary element to each of McNabb's and Jenkins' cause of action.

The evidence in this case indicates without contradiction that there were only three eye witnesses to the March 24, 2000 gasoline spill at the Cedar Grove Convenience Store in Marion County, Tennessee: William Simmons, Charles Love, and Sam Lambert. Simmons and Love testified they pushed the gasoline mixed with water to the site marked on the Remedial Solutions map as MW-3. Love was asked if he saw the gasoline go into a ditch. He responded, "No, it didn't run into a ditch. There wasn't no ditch there at that time. It was just an open field there, and the gas went off the pavement right into that open field" (Love Dep. at 26). Asked about a culvert going under U.S. 41, Love stated there was a culvert "way out here at the road," but that he did not see any of the spilled gas moving towards that culvert (Love Dep. at 26-27). Simmons testified that once the gasoline and water mixture reached the point marked as MW-3, he did not know what happened to it (Simmons Dep. at 48). He did not know the natural flow of water once it went over the bank (Simmons Dep. at 60). The water/gasoline mixture could have flowed toward U.S. 41 or it could have continued across the grassy field away from U.S. 41 (Simmons Dep. at 61). Neither Simmons nor Love provide any testimony to support McNabb's and Jenkins' theories that the gasoline from the March 24, 2000 spill migrated across U.S. 41 thereby causing gasoline contamination of the Property which the Stanfields bought from Mr. Jenkins.

The remaining eye-witness is Lambert. Lambert initially testified that the spilled gasoline crossed the convenience store parking lot and ran into a culvert along the convenience store property line that went under U.S. 41 to the Property at issue (Lambert Dep. at 30).

14

However, when questioned further about the gasoline and the culvert running under U.S. 41, Lambert stated he didn't remember where the gas was when he left the store, but he was "assuming" it had traveled the full length of the parking lot to a ditch (Lambert Dep. at 45-46). He also testified:

> Q. Do you remember when you were first answering questions the very first time for Mr. Lowe mentioning the gas going across the road?
> 
> Mr. Lowe: Objection.
> 
> A. Well, I guess I was assuming, because that's the only place it had to go. It had to be, I mean.

(Lambert Dep. at 45-46). The Court notes that Lambert, when he initially testified about the movement of the gasoline, did not testify that he *saw* the gasoline go into a culvert which runs under U.S. 41. Rather, he said it did so, but during later questioning, Lambert clarified that he had not seen where the gasoline went, he was only assuming it had done so. He provided no reason for this speculation. Thus, even when considering this evidence in the light most favorable to the nonmoving party, it provides no evidence to support Jenkins' and McNabb's theory that the March 24, 2000 gasoline spill contaminated the Property.

The only evidence before the Court concerning what eventually happened to the gasoline from the March 24, 2000 spill is the affidavit of professional geologist Dominick Amari which essentially provides that based on the topography of the area where the spill took place and around the spill, "the spill was directed to a location off the McNabb's property where the natural drainage took the spill away from the Jenkins' property" (Amari Aff. ¶ 9). Amari also noted that over one year elapsed from the time the spill occurred to the time gasoline was found in the ditch alongside U.S. 41 and "there would have been further dissipation, evaporation, and natural biomediation or biological degradation of the liquids due to micro organism activity"

15

during that time (Amari Aff. ¶¶ 5-6). The Oil Suppliers have noted that McNabb's regular gasoline underground storage tank was tested on April 10, 2001 and testing indicated that the tank was leaking .030028 gallons per hour (*See* Ex. 2 to McNabb Dep.). Over a one year period of time, this small amount per hour would result in a total leakage of 263.045 gallons of gasoline.

The Oil Suppliers have come forward with affirmative evidence in the form of expert testimony to show the gasoline spilled on March 24, 2000 did not cross U.S. 41 and contaminate the Property. Jenkins and McNabb have failed to produce any evidence to the contrary. Thus, there is no genuine issue of material fact concerning whether the March 24, 2000 fuel spill contaminated the Property. Based on the undisputed evidence presented to the Court, it did not, and the Oil Suppliers are entitled to judgement as a matter of law on all Jenkins' and McNabb's claims against them.

An appropriate Order shall enter.

ENTER:

                                              s/William B. Mitchell Carter
                                              UNITED STATES MAGISTRATE JUDGE